LULA KELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRANK KELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21010, 21011, 41622, 41623.   Promulgated February 12, 1935.

*John B. King, Esq.*, and *Leslie Humphrey, Esq.*, for the petitioners.
*J. L. Backstrom, Esq.*, *Shelby Faulkner, Esq.*, and *R. B. Cannon, Esq.*, for the respondent.

#### OPINION.

TURNER: The disputed deficiencies and the years involved in these proceedings are as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Frank Kell | 21011 | 1919 | $103,439.64 |
|  |  | 1920 | 8,500.00 |
| Do | 41622 | 1921 | 1,805.54 |
|  |  | 1922 | 33,946.84 |
| Lula Kell | 21010 | 1919 | 95,000.00 |
|  |  | 1920 | 5,500.00 |
| Do | 41623 | 1921 | 1,805.54 |
|  |  | 1922 | 33,946.84 |

In the original and amended pleadings more than 50 separate issues of fact and law were joined, but the parties, by stipulation, have agreed upon a basis of settlement of all these issues except

two. The stipulation is made a part of our findings herein and provides adequate basis for recomputation of the deficiencies under Rule 50 in respect of the issues covered therein.

The first issue left for our determination affects income for the years 1919 and 1922, and presents a question as to whether or not the petitioner, Frank Kell, by gift to his wife and children, divested himself of his interest in a partnership known as the R. O. Harvey Lease Account, so that the income thereafter derived from the partnership is taxable not as community income, but as that of his wife and children. The question presented by the second issue is whether or not the respondent erred in holding that the petitioner, Frank Kell, realized taxable income in 1920 from the sale of his interest in a certain railroad project. Where the words " the petitioner " are used in this respect, without other designation, we refer to Frank Kell.

### Issue No. 1.

In 1918 the petitioner, Frank Kell, owned one half of the capital stock of the Wichita Falls Mill & Elevator Co., while the remainder of the stock belonged to the Lasker estate, which was willing to sell its holdings for $600,000. He decided to buy the stock of. the Lasker estate for his wife and seven children, three of whom were married daughters. The purchase of the stock was discussed with his family, and an agreement was reached whereby $150,000 would be paid in cash and the remaining $450,000 by notes executed by his wife and children. These notes were dated June 1, 1918, and were endorsed by the petitioner, Frank Kell. The cash payment was made with funds advanced by the milling company.

The wife and children of the petitioner, Frank Kell, were without means to pay the notes given for the balance due on the stock. At or about the time of the purchase, a family conference took place at which ways and means for the payment of these notes were discussed. With reference to this conference, Frank Kell testified that, " We discussed the interest that I had in the R. O. Harvey Lease Account, and I agreed with them that I would provide the funds to take up these notes as they matured from the income from the mill, and from the proceeds or income from the R. O. Harvey Lease Account as they were paid, and we would have the reserve of my interest in the R. O. Harvey Lease Account with which to finally meet the obligations and take up these notes." Later in his testimony he stated, " I assured them that this reserve of my interest in the R. O. Harvey Lease Account would be transferred to them and assigned to them, the proceeds of which was to be used to meet these obligations."

The R. O. Harvey Lease Account was a partnership formed in 1917 by R. O. Harvey, J. J. Perkins, S. H. Cullum, and the petitioner, and was thereafter engaged in the business of buying, developing, and selling oil leases. No written partnership agreement was entered into between these partners and, although contributions of capital and services varied according to their respective abilities and the partnership needs, their interests in the partnership were to be equal. R. O. Harvey had charge of the books and records of the partnership and acted generally as manager of its affairs. S. H. Cullum was the field man, while J. J. Perkins and the petitioner gave assistance and advice whenever called upon.

During the partnership's first year it acquired oil leases to several thousand acres of land in Callahan, Erath, and Comanche Counties in the State of Texas, the title to all of these leases being taken in the name of R. O. Harvey. These leases were generally known and referred to by the partners as the " Comanche County Lease." During the summer of 1918 this block of leases was transferred to the Texas-Penn Oil Co. under a drilling contract. The partnership retained a royalty interest amounting to one sixteenth of the recovery therefrom. Following the transfer, the Texas-Penn Oil Co. began drilling operations and in September 1918 brought in a producing well.

After the family conference in 1918 nothing was done with reference to the R. O. Harvey Lease Account until the spring of 1919, when Frank Kell visited the office of the partnership and advised R. O. Harvey that he wanted his interest in the property transferred to Mrs. Kell and his children so that the " income or return " which might accrue therefrom " would come to them and not " to him. He testified that according to his recollection he gave the same instructions by letter, but, if so, the letter was not delivered or was mislaid, and under date of August 30, 1919, he wrote a letter which reads as follows:

WICHITA FALLS, TEXAS.
*August 30, 1919.*

Mr. R. O. HARVEY, Office,
    DEAR RALPH:
Confirming my verbal notice to you some ninety days since, I beg to advise that the interest in the Harvey Oil lease account which you have carried for my personal account is the property of Mrs. Kell, Mrs. O. C. Bullington, Mrs. J. F. O'Donohoe, Miss Willie Mae Kell, Miss Sybil Kell, Mrs. Wiley Blair, Jr., Joseph A. Kell and Miss Mary Joe Kell, share and share alike.

If the title to this property is carried in my name you continue it in this way so that the title can be made in the event of a sale, but any dividend arising from the sale of any of the R. O. Harvey Lease Account is payable to the parties above named, share and share alike, and checks should be made payable to Mrs. Frank Kell for herself and the parties above named.

Will you kindly take notice of the disposition of this property and enter same on your books in accordance herewith.

Any liability that may be incurred will be due to be paid by them, but I will hold myself personally responsible for the payment of same.

Yours very truly,

[Signed] FRANK KELL.

This letter was delivered and at some time thereafter a notation was made on the records of the partnership, at the top of the Frank Kell account, under date of August 30, 1919, as follows:

This interest transferred to Mrs. Frank Kell, Mrs. O. C. Bullington, Mrs. J. F. O'Donohoe, Miss Willie Mae Kell, Miss Sybil Kell, Mrs. Wiley Blair, Jr., Joseph A. Kell and Miss Mary Joe Kell, share and share alike.

This notation was made in ink. Above it, the account shows a pencil notation of the date May 30, 1919.

In July 1919 and prior to the letter of August 30, 1919, the Texas-Penn Oil Co. negotiated a sale of the Comanche County leases. For its one-sixteenth royalty interest the R. O. Harvey Lease Account received, during 1919, the sum of $700,000. The $175,000 covering the Kell share of the proceeds was paid to Frank Kell personally, as were all subsequent distributions.

R. O. Harvey testified that it was his recollection that he advised both Perkins and Cullum of his conversation with Frank Kell concerning the interest of the latter in the R. O. Harvey Lease Account. Perkins also testified that he had been so advised, and when asked whether or not he raised any objection, testified as follows:

No, I didn't raise any objection, because Mr. Kell, so Mr. Harvey said, had stated he would stand behind the proposition and would give us every assistance and would cause no complications of any kind to us, and it was quite immaterial to us whether Mr. Kell retained the interest or whether the family retained it, just so there were no complications. The legal title to all the property was in the name of R. O. Harvey.

In 1922, when a large block of leases was sold to the Magnolia Petroleum Co., all of the instruments of conveyance were signed by R. O. Harvey, J. J. Perkins, S. H. Cullum, and Frank Kell and recited that they were legal owners and holders of the leases conveyed. Some of the leases so conveyed were not the property of the R. O. Harvey Lease Account, but were owned jointly by the four individuals named.

According to the record, neither Mrs. Kell nor the children at any time had anything to do with the management of the affairs or operations of the R. O. Harvey Lease Account.

Under instructions from the petitioner Frank Kell, accounts were opened on his personal books for his wife and the seven children. All payments made from the R. O. Harvey Lease Account were first entered in a personal account of Frank Kell, headed "R. O. Harvey Lease Account." Thereafter transfers were made to the account of Mrs. Kell and the children. All of the sums received from the

R. O. Harvey Lease Account were so transferred except an amount equal to and representing the investment of Frank Kell in the said partnership. This amount was never credited to Mrs. Kell and the children, but remained in the account of Frank Kell personally.

The partnership return of the R. O. Harvey Lease Account for 1919 did not show Frank Kell as a partner, but carried the Kell interest in the income under the name of "Mrs. F. Kell et al." The return for 1922 was similar to that of 1919.

In 1922, when the sale of leases by the R. O. Harvey Lease Account was made to the Magnolia Petroleum Co., a check for $287,530, representing a one-fourth interest in the proceeds of the sale, was made to Frank Kell. The partnership affairs were closed out in 1923, and a final distribution of all the proceeds was made. According to the books of the petitioner, Frank Kell, the total amount received from the R. O. Harvey Lease Account was $505,472.35.

The notes given by Mrs. Kell and her children as a part of the purchase price of the capital stock of the Wichita Falls Mill & Elevator Co. were paid as they fell due, except that the last series of notes was extended. By the end of the year 1921, $94,470 had been paid by the petitioner, Frank Kell. The balance on the notes which had matured and interest, approximating $300,000, had been paid by advances from the Wichita Falls Mill & Elevator Co. Thereafter the proceeds from the R. O. Harvey Lease Account were used partly in repaying the Wichita Falls Mill & Elevator Co. and partly in payment of the notes. The account covering the purchase of the stock was liquidated in 1929. There is nothing in the record to show what portion or amount of the sums received from the Wichita Falls Mill & Elevator Co. and used in payment of the notes represented dividends.

On this record we must decide whether or not Frank Kell made a gift to Lula Kell, his wife, and their children of his interest in the R. O. Harvey Lease Account so that the income received thereafter from the partnership was not the income of the marital community but the separate income of his wife and children. If Lula Kell and the seven children did acquire the income producing property itself, the income therefrom was their separate income and the Commissioner's determination on this point must be reversed. *Rose* v. *Commissioner*, 65 Fed. (2d) 616; *Commissioner* v. *Olds*, 60 Fed. (2d) 252. See also *Copland* v. *Commissioner*, 41 Fed. (2d) 501. If, on the other hand, the action on the part of Frank Kell was only an assignment of a bare right to the income thereafter received by him from the R. O. Harvey Lease Account, the action of the respondent must be sustained. *Burnet* v. *Leininger*, 285 U. S. 136, and *Lucas* v. *Earl*, 281 U. S. 111.

The facts are not at all clear. From some of the incidents it would definitely appear that there was never any intention on the part of

Frank Kell to make a gift of anything other than the profits to be derived by him from the partnership. Other facts taken separately tend to show that he made an absolute gift of his entire partnership interest. Under these circumstances, we must consider all of the evidence before us which reflects the intention of the donor and from the complete picture draw our conclusions.

Based on these considerations, it is our opinion that no effective gift was made by Frank Kell of his interest in the R. O. Harvey Lease Account. In the first place, the matter of primary importance to Frank Kell and his family was the purchase of the stock in the Wichita Falls Mill & Elevator Co. and the payment of the notes given therefor. His wife and children had no means with which to pay these notes, and he volunteered the use of " proceeds or income from the R. O. Harvey Lease Account." There is nothing in the record which indicates that he had any intention of providing a sum greater than that necessary, when considered in connection with the dividends to be derived from the Mill & Elevator Co., to pay the notes and interest thereon. Nor is there anything in the record to show that the wife and children considered that they had any interest in the R. O. Harvey Lease Account as such. So far as they were concerned, it was merely the reservoir from which Frank Kell was to provide the funds with which to pay their obligations under the notes.

While it is true that Frank Kell gave instructions that his interest in the partnership be transferred to his wife and children, it is also apparent, both from his letter of October 30, 1919, and from the testimony of Harvey, and particularly of Perkins, that he would still remain responsible for any obligations pertaining to the account. Taking the record as a whole, we believe that they considered his instructions as nothing more than a designation by him of the recipients of his share in the profits of the partnership and that they still considered him as a partner in the enterprise. We are convinced that this is true, even though Lula Kell and her children were listed as partners on the partnership returns.

One of the most convincing facts tending to show that the petitioner, Frank Kell, did not make or intend to make a gift of his partnership interest is the fact that when the first distribution was made by the partnership and the one-fourth interest in the sale of the Comanche County lease was paid to him, he retained in his own account the full amount of his investment in the partnership and never at any time was any portion of this sum paid over or credited to his wife and children. From this it appears that as a matter of actual fact even on the books of the petitioner, Frank Kell, nothing was ever credited to or used for the benefit of Lula Kell or the children from the R. O. Harvey Lease Account except the profits.

It is also of interest to note that there was no systematic handling of the funds derived from the lease account in payment on the notes. When the notes fell due, they were paid by Frank Kell personally or with the money received from the Wichita Falls Mill & Elevator Co., which, by the end of 1921, had provided some three hundred thousand dollars for that purpose. There is nothing in the record to show what portion of this sum represented dividends payable on the stock purchased in the name of Lula Kell and the children and what portion represented advances which would have to be repaid to the company at a future date. The petitioner, Frank Kell, apparently handled these to suit his own convenience and the account was not balanced and closed until the year 1929, even though the R. O. Harvey Lease Account was liquidated in 1923 and Frank Kell had received one fourth of all the proceeds.

After careful consideration of the evidence presented, we hold that Frank Kell did not make a gift to his wife and children of his interest in the R. O. Harvey Lease Account and, under the rule laid down in *Burnet* v. *Leininger*, *supra*, the respondent is sustained in his determination that the partnership profits are the income of the community and not the separate income of Lula Kell and the seven children.

### Issue No. 2.

Early in 1919 the petitioner, Frank Kell, and a number of associates were making plans to build a railroad from Breckenridge to Newcastle, Texas. Newcastle was connected with Wichita Falls by the road of the Wichita Falls & Southern Railway Co. At about the same time Jake L. Hamon, of Ardmore, Oklahoma, and associates were planning the construction of a similar railroad from Breckenridge south to Dublin, Texas, where it would connect with the St. Louis–San Francisco Railway Co., more commonly known as the Frisco. On June 3, 1919, they decided to combine their efforts and capital and to construct the two units of railway as a joint enterprise. A contract covering their agreements in that respect was accordingly drawn up and signed on that date by Frank Kell and Jake L. Hamon.

This contract, after reciting the undertakings contemplated and stating that each party expected to receive donations of money and rights of way to be used in their respective projects, provided that all of the donations so received should be joint and equal; and further stated that " all of said property, money, rights, and benefits so acquired or obtained by the respective parties * * *, for the use and application to railroad purposes ", should " be devoted to those purposes, and transferred, assigned, and properly conveyed to

the proposed railroad corporation, later to be incorporated * * *, and to be so transferred, assigned, and conveyed to said corporation " when and as the same should become necessary and proper.

The contract also contained the following:

On the final completion of the said line of railway and the putting of the same into operation, that is the line of railway from the point of connection with the Frisco Railroad to Wichita Falls, then either party hereto at his election shall be entitled to an accounting, distribution, and division of all of the said joint property then remaining in hand. The said respective parties hereto obligate and bind themselves to hereafter incorporate and to procure the incorporation of a railroad company for the construction and the operation of the said line of railway between the said junction point with the Frisco and the said city of Wichita Falls, and to proceed thereafter with the construction of such line of railway and the procuring of all necessary and proper power and other equipment for its operation, which power and equipment is to be property of the said proposed railroad corporation.

Each party to this contract was also obligated to subscribe and pay for one half of the bonds and stock of the proposed corporation and also obligated to pay one half of the amount to be expended in the acquisition of town sites and in constructing and putting into operation the line of railway.

Pursuant to the terms of the contract, construction of the railroad beginning in Dublin and working northward was begun under the name of Hamon and Kell. On September 9, 1919, Jake L. Hamon, for himself and associates, entered into a contract with certain citizens of Breckenridge, whereby these citizens agreed to contribute certain money and lands to be used in the construction of the railroad from Breckenridge south to Dublin. At the same time Frank Kell, for himself and his associates, entered into a similar contract with citizens of Breckenridge, relating to the construction of the railroad from Breckenridge north to Newcastle. This contract executed by Hamon with reference to the railroad from Breckenridge south contained a provision to the effect that the contemplated railroad corporation might be availed of, if necessary, for any condemnation proceedings to procure right of way, and that the citizens of Breckenridge, parties of the second part, should hold the said corporation and Hamon harmless from all costs, expenses, disbursements, and damages. The contract also contained a provision which read as follows:

It is contemplated that parties of the second part will execute a contract with Frank Kell and J. A. Kemp for the construction of a standard gage railroad from a point of intersection of the Wichita Falls and Southern to the City of Breckenridge, Stephens County, Texas, and it is mutually agreed between the parties hereto that the incorporation of one railroad company for the construction of the line herein described and the line described in the contract between Frank Kell and J. A. Kemp and the parties of the second part, will be a compliance with the terms of this contract providing for the incorporation of a

railroad company for the construction of a line from the City of Breckenridge in a southerly direction to a point of approximately twenty miles in a southerly direction from the intersection of the proposed railroad with the Texas and Pacific Railroad.

\*　　\*　　\*　　\*　　\*　　\*　　\*

. It is agreed by all the parties hereto that although this contract is executed by Jake L. Hamon as party of the first part and the provisions hereof run in his name, it is for the benefit not only of himself but any assigns, associates or nominees he may designate and for the like benefit of any railroad corporation that he may name, the obligations thereof in favor of said Jake L. Hamon being in all respects for the like benefit of any such assigns, associates, nominees or railroad company.

The contract between the petitioner, Frank Kell, and citizens of Breckenridge, with reference to the construction of the railroad north of Breckenridge to Newcastle, contained provisions similar in substance to those referred to in the contract executed by Hamon with reference to the road to be constructed from Breckenridge south.

At the time of hearing it was agreed by the attorneys for the parties to these proceedings that these contracts were representative of all contracts entered into with reference to donations of money and land for use in the construction of the railroad.

By June 1920 the road had been completed from Dublin to Breckenridge. About that time friction arose between Hamon and Kell. The cause of this friction was Hamon's practice of entering into obligations in the name of Hamon and Kell without consulting Kell or his associates. It also appears that Hamon had made some variations with reference to the course the road was to follow from Breckenridge north and had taken the necessary steps for completion of the road into Jimkurn, Texas. It also developed that Hamon was opposed to the construction of the road beyond Jimkurn by reason of the fact that it would run through some undeveloped territory and would require the expenditure of a very substantial sum in bridging the Brazos River. As a result of these differences a second contract was entered into by and between Jake L. Hamon and Frank Kell, under date of August 30, 1920, wherein it was provided that Frank Kell and his associates would transfer to Hamon and his associates all of their rights and interests in the road constructed and to be constructed from Dublin to Jimkurn. It was also provided that Kell and his associates would transfer all of their rights in Liberty bonds, amounting to $150,000, which they had posted with the Frisco Railroad to secure payment of one half of the amount due the Frisco for steel rails used in the construction which had been completed at that time. In return for this transfer on the part of Kell and his associates, Hamon and his associates paid over to Kell and associates the sum of $1,050,000 and agreed to pay all of the obligations then outstanding against Hamon and

Kell on account of the construction work already done. Kell and his associates agreed to take over and carry out all obligations in connection with the construction of the railroad north from Jimkurn to Newcastle.

At the time the contract of August 30, 1920, was entered into, Kell and his associates had paid in to Hamon and Kell for use in construction work the sum of $625,000 in cash. There had also been received for similar purchases cash donations and grants of land amounting to $635,279.69.

Hamon was killed in November 1920, and shortly thereafter demands were being made by creditors of Hamon and Kell for payment of amounts due in connection with the construction of that portion of the railway acquired by Hamon and his associates under the contract of August 30, 1920. In December 1920, after demands by some of these creditors upon Frank Kell and his associates, $50,000 was procured from the Hamon estate to be used in payment on these accounts. Subsequently, in 1921, some of the creditors filed suits against Kell and his associates on the basis of the partnership arrangement which they had had with Hamon. Kell arranged for the payment of some of these obligations by the Wichita & Southern Railway Co. which had been acquired by him and his associates for the purpose of constructing the railroad from Jimkurn, north. The Wichita & Southern Railway Co. was later reimbursed by the National City Bank of New York for all amounts so expended, the National City Bank being interested in the settlement of the Hamon estate, and in the Wichita Falls, Ranger & Fort Worth Railroad Co., which had been organized and had taken over the road constructed by Hamon and Kell.

It is contended on behalf of the petitioner, Frank Kell, first, that the transaction between him and Jake L. Hamon, for themselves and their associates, on August 30, 1920, did not constitute a closed transaction from which gain or loss is determinable; and, second, that if it does represent a closed transaction, the petitioner, Frank Kell, is entitled to include in his basis for determining the gain realized an amount representing one half of the donations of cash and land received in connection with the construction of the railroad from Dublin to Jimkurn.

The petitioner advances two arguments in support of his contention that the agreement of August 30, 1920, does not reflect a closed transaction. One is that Kell and his associates were still liable to the creditors in respect of obligations entered into under the name of Hamon and Kell for the construction of the railroad sold to Hamon and his associates, and, further, under the terms of the agreement, Kell and his associates assumed the obligation to con-

struct the railroad north from Jimkurn into Newcastle, and that these operations constituted merely parts of the whole and neither gain nor loss could be realized until the debts of Hamon and Kell had been paid and the line from Newcastle to Dublin had been finished.

In *L. C. Heydrick*, 7 B. T. A. 950, an appeal by one of Kell's associates, we considered the question whether or not the transaction of August 30, 1920, was a closed transaction. In our opinion in that case we stated:

> An entirely changed state of affairs existed after the sale to the Hamon interests. Kell and his associates were engaged in an undertaking of their own, in which they were entirely responsible, i. e., the building of the railroad from Breckenridge to Newcastle. As a partnership, they had sold their right, title and interest in the railroad thus far constructed, and upon receipt by Kell, his associates received income to the extent of their distributable interest therein. It may well be that in the construction of the railroad from Breckenridge to Newcastle, they were called upon for contributions in excess of the sums received from the partnership arising out of the Hamon transaction, but, if so, that was another transaction requiring the investment of capital with which we are not here concerned. Neither should we be concerned with the suits instituted against Kell and his associates, in years subsequent to 1920, by reason of the failure of Hamon to pay all claims which he agreed to pay by the contract of September 1, 1920. In the first place, no losses have in fact been shown to have resulted, by reason of the suits, and in the second place, Kell and his associates believed Hamon to be fully solvent when the sale was made and did not contemplate that any liability would ever result. We are of the opinion that the evidence concerning this issue does not prove the error alleged.

We find no additional facts in the cases now before us sufficient to justify a conclusion different from that reached in the case of *L. C. Heydrick, supra*, and we accordingly hold that the transaction of August 30, 1920, was a closed transaction giving rise to gain or loss.

The only question now remaining is whether or not one half of the donations in cash and land should be included as a part of the basis for determining the gain or loss realized by Kell and his associates upon the disposition of their interests in the railroad from Jimkurn to Dublin. In that respect the contention of the respondent must also be sustained. In all of the contracts, including those between Hamon and Kell and the contracts between these two individuals and the citizens of Breckenridge, Texas, which according to agreement were declared representative of all other contracts covering donations, it very definitely appears that these donations were made for use in the building of the railroad and in its operations thereafter and were to be for the benefit of a corporation or corporations, to be formed for the purpose of constructing the railroad and operating it after construction.

There is nothing whatever in the contracts with citizens making donations which would give Kell and his associates or Hamon and his associates the right to take out of the project any portion of the money and lands so donated, and, further, we find nothing in these contracts which would form a basis for the inclusion by Kell and his associates of any portion of the donations or contributions as amounts paid by them into the project. Clearly their interest in the railroad company, as of August 30, 1920, had cost them $625,000 in cash and $150,000 in Liberty bonds, or a total of $775,000. This interest they sold to Hamon and his associates for $1,050,000 and the assumption of all partnership liabilities, and the difference between the cost and selling price represents the amount of their taxable gain.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*